UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BUFFEY SIMON-LEONARD,

     Plaintiff,

v.                                                Case No: 8:15-cv-2655-T-36JSS

PASCO COUNTY SCHOOL BOARD,

     Defendant.

_____/

# **ORDER**

This matter comes before the Court upon Defendant Pasco County School Board's ("School Board") Motion for Summary Judgment (Doc. 17). In the motion, Defendant argues that Plaintiff has failed to identify: (1) direct evidence of pregnancy discrimination; (2) a true comparator to use in her attempt to prove discrimination based on circumstantial evidence; (3) sufficient circumstantial evidence to establish a *prima facie* case without a comparator; (4) a causal connection between Plaintiff's protected activity and any alleged adverse action; and/or (5) any evidence or basis for concluding that the School Board's actions or offered explanations for any actions were a pretext for unlawful conduct. Plaintiff responded in opposition ("response in opposition") (Doc. 24), to which Defendant replied (Doc. 26). In addition, the School Board filed a Motion to Strike Plaintiff's Untimely Filed Exhibits (Doc. 28), to which Plaintiff did not file a response. The Court, having considered the parties' submissions, including depositions, declarations, and exhibits, and being fully advised in the premises will now grant Defendant's Motion for Summary Judgment and grant Defendant's Motion to Strike.

# I.    BACKGROUND AND STATEMENT OF FACTS[1]

This action arises from allegations that Plaintiff suffered sex/pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Florida Civil Rights Act ("FCRA") and retaliation in violation of the same statues. Plaintiff started her employment with the Pasco County School Board in 1998 as a substitute teacher, and she then worked as a Varying Exceptionalities ("VE") teacher until her promotion to Assistant Principal ("AP") at Hudson Middle School ("HMS") at the start of the 2006/2007 school year.[2] Doc. 18; Ex. 1, Pl. Deposition ("Pl.") at 30:25-31:5.

**Plaintiff's First Principal Steve Van Gorden**

In 2006, Steve Van Gorden was the principal of HMS and recommended Plaintiff for the AP position for the 2006/2007 school year. Doc. 19; Ex. 36, Tiede Declaration ("Tiede Dec.") ¶4. Then-Assistant Superintendent of Middle Schools Tina Tiede provided supervisory support to a subset of schools, including HMS. Doc. 19; Ex. 36, Tiede Dec. ¶¶1, 2, 3. Tiede and Van Gorden had regular discussions regarding Plaintiff's performance, and thereafter, Tiede began scheduling regular meetings at HMS. Tiede Dec. ¶4.

On November 11, 2007, Tiede and Van Gorden had a meeting with Plaintiff to review a number of problems with her performance. Pl. at 32:3-24; Doc. 18; Reprimand Ltr., Ex. 3. The meeting topics included Plaintiff's work ethic, honesty, commitment to her job, and communication, among other concerns. Pl. at 33:7-15; Ex. 3; Tiede Dec. ¶5. In particular, Tiede and Van Gorden spoke with Plaintiff about an incident where she failed to return to HMS after a

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including stipulated facts, declarations, exhibits, and deposition testimony.

[2] APs are contracted for a certain number of days (*e.g.,* 245, 230, 216). Pl. at 60:5-11; Doc. 19; Ex. 27, Holback Deposition ("Holback") at 25:17-21. Barbara Marshall held the 245-day position at HMS; Plaintiff held the 230-day contract (meaning that she did not work over the summers). Pl. at 59:7-60:4.

half-day off-site meeting and then lied about her whereabouts.[3] Doc. 18; Exs. 2, 3; Tiede Dec. ¶5; Ex. 30, Van Gorden Deposition ("Van Gorden") at 9:9-21. Plaintiff acknowledged that as of November 19, 2007, she understood that both Tiede and Van Gorden had concerns about her performance. Pl. at 35:17-20. Overall, Van Gorden describes Plaintiff as having "potential," but identified Plaintiff's commitment to putting the time needed into the job of Administrator and honesty as his main areas of concern. Van Gorden at 8:10-20, 9:2-8.

**Plaintiff's Second Principal Phillip Kupczyk**

At the end of the 2008/2009 school year, Van Gorden transferred and Phillip Kupczyk became the Principal. Pl. at 43:12-14; Doc. 19; Ex. 28, Kupczyk Deposition ("Kupczyk") at 6:20-25. Kupczyk described the professional relationship with Plaintiff as "average." Kupczyk at 16:13-14. Kupczyk felt Plaintiff lacked leadership qualities, including the ability to be a self-starter. Kupczyk at 9:25-10:12; Kupczyk Dec. ¶2; Tiede Dec. ¶9. For example, within Kupczyk's first few days at HMS, he was instructed to reduce one of two Exceptional Student Education ("ESE") teachers who had equal seniority. Kupczyk at 11:2-12:12; Kupczyk Dec. ¶4. Kupczyk did not know either teacher yet, so he solicited input from Plaintiff (who oversaw ESE and had been at HMS for three years), and she responded, *"I'd rather not say which one. That's why you get paid the big bucks, to make those decisions."[4]* Kupczyk at 10:18-11:4, 12:5-7; Kupczyk Dec. ¶4. Kupczyk also did not feel supported by Plaintiff, as he received direct reports from a number of teachers that Plaintiff actively undermined him by telling the staff they did not need to support his initiatives. Kupczyk at 12:13-13:8; Kupczyk Dec. ¶5; Tiede Dec. ¶9. Kupczyk and Tiede

---

[3] On November 29, 2007, Van Gorden issued Plaintiff a Formal Reprimand for this incident. *See* Pl. at 35:24-36:7; Doc. 18, Ex. 3; Doc. 29 ¶ 8.

[4] Kupczyk was later able to observe both ESE teachers, and one was obviously superior. Kupczyk Dec. ¶4. In Kupczyk's opinion, Plaintiff could have easily identified the appropriate teacher to be reduced, but Kupczyk believes she refused to do so because she did not want to take responsibility for the decision or be disliked by the teachers. *Id.*

spoke regularly during the school year, and he shared concerns about Plaintiff. Kupczyk at 10:23-11:1; Kupczyk Dec. ¶6; Tiede Dec. ¶9. Tiede encouraged Kupczyk to try and stay positive during his first year and work to build bridges with his new staff. Kupczyk at 13:9-14; Tiede Dec. ¶10.

**Tiede Plans to Transfer Plaintiff**

As the 2009/2010 school year drew to a close, Tiede decided to transfer Plaintiff out of HMS due to her continued poor performance and failure to improve. Kupczyk Dec. ¶7; Tiede Dec. ¶11. However, before Tiede could meet with Plaintiff to communicate the decision, Plaintiff left work due to complications with her first pregnancy. *Id.* Tiede chose to forego the disciplinary transfer at that time. Kupczyk Dec. ¶7; Tiede Dec. ¶11.

**Plaintiff's Third Principal Terry Holback**

Kupczyk voluntarily stepped down at the end of the 2009/2010 school year due to health issues (Kupczyk at 7:1-10; Kupczyk Dec. ¶8), and Terry Holback replaced him. Holback Dec. ¶2. Plaintiff's first child was born May 29, 2010, and she returned to HMS in August 2010. Pl. at 19:10-14, 44:17-45:8.

**Tiede Meeting with Plaintiff on August 22, 2010**

On August 22, 2010, Tiede met with Plaintiff at HMS to discuss her performance to date, along with expectations for going forward. Pl. at 45:10-23; Tiede at 19:25-21:2; Tiede Dec. ¶12; Ex. 5. Tiede invited Holback to attend. Holback at 20:7-21; Doc. 19; Ex. 33, Holback Dec. ¶3; Tiede Dec. ¶12. Tiede specifically spoke with Plaintiff about the fact that both of her prior Principals shared similar types of complaints about her performance which Tiede believed indicated that Plaintiff was not improving. Tiede Dec. ¶12.;Holback at 21:5-25; Holback Dec.

¶3. At that meeting, Plaintiff understood that Tiede was concerned about her performance (Pl. at 48:13-17), and that her performance would be monitored going forward. Pl. at 45:14-18.

As Holback's first year progressed, Holback started to have some concerns about Plaintiff's performance, specifically her leadership, which she discussed with Tiede. Holback at 35:21-36:2; Holback Dec. ¶6; Tiede at 21:3-16; Tiede Dec. ¶¶12, 13. During the 2010/2011 school year, Assistant Principal of HMS Barbara Marshall, who held the 245-day position, announced her intent to retire in November 2012. Holback Dec. ¶7. Plaintiff spoke with Holback on a number of occasions about the 245- day position. Pl. at 59:7-21; Holback Dec. ¶7. Holback informed Plaintiff that she relied more heavily on the 245-day AP, as they were typically more experienced (as held true at HMS), and on some days, "it may feel like a 24/7 job." Holback Dec. ¶7. Holback wanted Plaintiff to understand that the position was not just an increase in contracted days, but also in responsibility. *Id.*

In July 2011, Beth Brown became the Executive Director of Secondary Schools, reporting to Tiede. Doc. 19; Ex. 31, Brown Declaration ¶3. Tiede and Brown reconfigured supervisory responsibility for the schools, and Brown took over HMS. Brown Dec. ¶3. Brown and Tiede reviewed and discussed all of the schools in the District, and they identified five Administrators that were of "significant concern[]," one of which was Plaintiff. Brown at 21:11-25, 23:1-25; Brown Dec. ¶4; Tiede Dec. ¶14. Brown visited her schools at the start of the 2011/2012 school year, and when she met with Holback, they discussed Plaintiff's challenges to date. Brown at 22:19-25; Brown Dec. ¶5; Holback Dec. ¶8.

In particular, on August 10, 2011, Holback discussed with Plaintiff the expectations of the 245-day position, a higher level administrative position that would become available in November 2012. Doc. 2 ¶14. Holback explained that the position requires round-the-clock

availability, even mentioning that she regularly contacts the current 245 AP during vacations and after school hours. *Id.* At that time, Plaintiff expressed to Holback her interest in becoming a principal in the future, and that she would like to add to her family. *Id.* Plaintiff did not have set hours (absent the obvious expectation that she be there with the students) and was expected to exercise her professional judgment on how to get her work done. Holback at 27:20-24, 31:2-18; Holback Dec. ¶9.

**Pregnancy Inquiry by Principal Holback[5]**

On September 15, 2011, Holback asked Plaintiff to step out of a candidate interview. Pl. at 77:22-78:4; Holback Dec. ¶34. Once in Plaintiff's office, Holback asked her if she was pregnant. Pl. at 77:22-78:14, 168:16-21. Holback's question was prompted by staff asking her if Plaintiff was pregnant. Holback at 37:2-22; Holback Dec. ¶34. Plaintiff told her "no," and claims Holback then asked if she was trying, to which she responded she planned to have another child in August. Pl. at 78:6-14. Plaintiff claims she told Brown about the Holback conversation during their December 5 meeting.[6] Pl. at 127:21-128:5. Plaintiff did not use the word "discrimination" when talking to Brown, nor did she allege disparate treatment (Pl. at 127:21-128:1) and Brown did not perceive the discussion as a discrimination complaint. Brown Dec. ¶24.[7] Plaintiff believes Holback began discriminating against her after that conversation because she did not want to lose an Administrator to medical leave down the road.[8] Pl. at 80:14-21. Plaintiff stated the following:

---

[5] While the parties disagree as to the timing and exact details of the discussion, both agree a conversation occurred.
[6] Brown thinks she learned of the Holback conversation during the spring. Brown Dec. ¶13.
[7] Brown believes the Holback conversation was appropriate, and the fact it concerned Plaintiff's rumored pregnancy irrelevant. According to Brown, if a Principal hears a rumor from staff that one of her APs is going to be leaving, no matter what the reason, the Principal should investigate and talk to the AP about it so if the rumor is true, the school can plan for it. Brown Dec. ¶13; Brown at 34:7-35:8.
[8] Coverage for Administrator leave is reviewed on a case-by-case basis, and the District will place an "AP on Assignment" at a school to cover for an absence where appropriate. Brown Dec. ¶14.

Q: And why do you think this was [disparate treatment] because you were planning to have a child and ultimately became pregnant?

A: Yes.

Q: But why do you think that?

A: Barb Marshall was retiring in November and Ms. Holback knew that if I was pregnant and leave at the same time, she would be down two assistant principals.

Q: So this is simply a timing issue []?

A: Yes.

Q: And that's the only reason you think this treatment was due to the fact you were planning to have a child and ultimately became pregnant?

A: Yes.

Pl. at 219:8-24.

**First Notice of Performance Concerns**

On September 20, 2011, at 7:00 p.m., Plaintiff approached Holback at a school event and told her she was going to leave work the next morning in order to meet an alarm company at her house. Pl. at 50:4-51:2; Doc. 18, Ex. 4. Holback asked Plaintiff to meet her the next morning before she left, which did not happen. Holback Dec. ¶¶10, 11. Holback was concerned that, *inter alia*, Plaintiff scheduled a non-emergency personal appointment during the school day, gave only 15 hours' notice, disregarded her mandatory work meeting, and did not meet with her prior to leaving that morning. Doc. 18, Ex. 4; Holback Dec. ¶¶10, 11. Plaintiff agreed that Holback's request for advance notice of her intent to be absent was "absolutely" fair. Pl. at 54:19-55:7.

Holback met with Plaintiff later in the day on September 21, at which time Plaintiff asked Holback to ask other Principals about what they expected from their APs. Pl. at 56:6-58:15. Holback did as Plaintiff asked, and she spoke with Brown and five other Principals who agreed with Holback's expectations. Brown Dec. ¶6; Holback Dec. ¶13. Holback met with Plaintiff the next day and told her that she spoke with other Principals and they confirmed her expectations were in line with their own. Pl. at 58:16-59:6, Ex. 5; Holback Dec. ¶14. Thereafter, Plaintiff received from Holback, the job description for the AP position (Ex. 6),[9] along with the Florida

---

[9] The description notes "extended hours beyond the regular school day may be frequently required." Pl. Ex. 6.

Multidimensional Leadership Assessment ("FMLA") Matrix. Pl. at 62:7-11, 21-63:19-20, Ex. 5;

Holback Dec. ¶14. Finally, Holback informed Plaintiff that per her request, weekly

administrative meetings would be scheduled for Mondays from 3:00-5:00. Ex. 5; Brown Dec. ¶6;

Holback at 32:10-33:2, 33:5-8; Holback Dec. ¶14.

**Brown Warns Plaintiff About Non-reappointment**

On November 9, 2011, Holback notified Plaintiff that Brown would be meeting with

them on December 5. Pl. at 64:9-15, Ex. 7. On December 5, Brown, Holback and Plaintiff met at

HMS, and Brown summarized the meeting in a formal correspondence which Plaintiff agrees is a

"pretty close" description of what happened. Pl. at 65:6-66:1, Ex. 11. Brown assigned Dimension

5.0 (Communication) on the FMLA Matrix to Plaintiff, so she could be evaluated throughout the

year on it, and specifically, on the sub-dimension of whether "the leader actively listens and

analyzes input and feedback," where Brown scored Plaintiff as "unsatisfactory." Ex. 11; Brown

Dec. ¶8. In her correspondence, Brown warned Plaintiff that if her "performance does not

improve, I will recommend to the Superintendent that your contract not be renewed at the close

of this school year." Pl. at 73:12-17, Ex. 11. On January 28, 2012, follow-up meetings with

Brown were scheduled for 2/23, 3/22, 4/26 and 5/24. Doc. 18; Ex. 9. Brown and Holback met

with Plaintiff on March 22 as scheduled. Pl. at 107:25-108:7, Ex. 14; Holback Dec. ¶20 attached

Ex. D. Plaintiff admits that as of March, she "didn't go out of my way to be friendly" with

Holback or Marshall and only communicated with Holback via e-mail. Pl. at 234:7-236:1, 236:9-

13.

In March 2012, Holback assigned Plaintiff FCAT testing. Pl. at 216:3-9, 218:2-4;

Holback Dec ¶21; Holback at 48:4-18. Marshall helped train Plaintiff. Pl. at 216:16-18, 217:8-

12; Holback Dec. ¶21. The 245-day AP typically ran FCAT. However, Plaintiff viewed this assignment as a punishment. Pl. at 76:13-77:10. In late March, after FCAT testing concluded, Plaintiff told Holback she was pregnant with her second child. Pl. at 191:16-21.

**Second Notice of Performance Concerns**

On April 26, 2012, Holback issued Plaintiff a conference summary to document their conversation that day; the information was formalized into a Second Notice of Performance Concerns dated May 4. Pl. at 97:5-18, Ex. 11, 14; Holback Dec. ¶25 attached Ex. E. In addition to reviewing the fact that Plaintiff was at lunch during a scheduled conference call, Holback expressed her serious concerns about her oversight of the Emotionally and Behaviorally Disabled ("EBD") unit. Pl. at 97:19-98:25, Ex. 11; Holback Dec. ¶¶22-25. Plaintiff admittedly approved lesson plans for the EBD classroom that were deficient in a number of critical respects. Pl. at 98:15-100:18; Ex. 11; Holback Dec. ¶22. Plaintiff also admits that the movies and violent video games that had been in the classroom were inappropriate, but contends that she did not know about them until Holback told her. Pl. at 101:3-9; Holback Dec. ¶25.

The Second Notice also concerned Plaintiff's decision to place a student that was a behavioral problem (six referrals) in the office as a helper. Ex. 11; Holback Dec. ¶23. Plaintiff's decision violated Florida Department of Education guidelines because the student was below grade level, and Plaintiff removed her from two periods of Read 180. Pl. at 102:7-104:14, Ex. 11; Brown Dec. ¶11; Holback Dec. ¶23. Although Plaintiff made the decision in conjunction with non-administrative staff members, she was the only one with authority to make the decision, which she admits. Pl. at 104:1-14; Brown Dec. ¶11; Holback Dec. ¶25. The Second Notice attributes this statement to Plaintiff:

> It doesn't matter what I do because it will never please you. You are on a witch-hunt and looking for things to use against me. You are purposely overloading me

with work so that I cannot get everything accomplished. You have never liked me and just want to get me fired."

Ex. 11. Plaintiff admits she "might have said something to that effect." Pl. at 104:15-25.

**Third Notice of Performance Concerns**

The Third Notice involved Plaintiff's poor organization of HMS's athletic banquet on May 17, 2012. Doc. 18; Ex. 16. Because Plaintiff said the banquet was ready to go, Holback voluntarily offered to cover it for her. Pl. at 108:23-109:7, 111:12-23, Ex.15, 16; Holback Dec. ¶26. There were numerous problems with the banquet, including Plaintiff's failure to provide seating assignments until just before the event, students mislabeled or left out of the Program, and no certificates for the girls' basketball team, which made some parents upset. Pl. at 109:9-110:21, 111:24-113:10, Pl. Ex. 16; Holback at 45:20-46:20; Holback Dec. ¶27. Plaintiff admits she could have done a better job. Pl. at 113:3-10, 244:10-13. That same day, Plaintiff verbally notified Holback and Marshall that she would need to have her workweek restricted to 40 hours per week because she was getting swollen from her pregnancy. Pl. at 113:14-114:8; Pl. Ex. 17. Holback expressed concern because Plaintiff was scheduled to chaperone Saturday night's Grad Night field trip to Orlando and offered to have somebody else cover it. Pl. at 117:10-117:16, 118:2-10; Holback Dec. ¶29. Of her own choosing, Plaintiff attended Grad night, despite the work restrictions. Pl. at 116:1-18.

**Plaintiff's May 21, 2012 meeting**

On May, 21, 2012[10], Brown, Holback, and Plaintiff held another regularly scheduled meeting. Pl. at 120:20-121:2, Pl. Ex. 18; Brown Dec. ¶16; Holback Dec. ¶31. During the meeting, Plaintiff stated that she "had no idea" how to improve her relationship with Holback,

---

[10] While the original date for this meeting had been 5/24, it was rescheduled to 5/21 sometime before 5/16. Holback Dec. 30 attached Ex. G.

and stated that Brown did not listen to her and routinely sided with Holback. Pl. at 123:23-125:9;

Brown Dec. ¶17; Holback Dec. ¶31. Thereafter, Plaintiff disagreed with Holback's version of

events to which Brown asked "are you calling her a liar?" and Plaintiff responded "well, if that's

the way she was told and that's the way she believes, then I guess."[11] Pl. at 123:23-124:14;

Brown Dec. ¶18; Holback Dec. ¶31. Brown ended the meeting early. Brown Dec. ¶18; Brown at

40:12-41:14. In Brown's opinion, Plaintiff's attitude had become so negative and her work

performance so poor, the HMS Administrative team could not operate effectively, and in turn,

the school was going to suffer. Brown Dec. ¶19; *see also* Brown at 40:12-41:14.

**Plaintiff is Reassigned to District Office and Her Appointment is Not Renewed**

Brown immediately met with Tiede to discuss what had happened during the May

meeting.[12] Brown at 40:12-41:14; Tiede at 23:20-24:10. Brown recommended removing

Plaintiff from HMS immediately and that her contract not be renewed; Tiede agreed, as did then-

Superintendent Fiorentino. Ex. 18; Brown at 40:6-11, 50:16-22; Brown Dec. ¶19; Tiede at

23:8-24:19; Tiede Dec. ¶¶15,16. Brown and Tiede did not confer with, or seek input from,

Holback with respect to either decision. Brown Dec. ¶19; Holback at 57:18-58:10, 59:17-

60:1.

On May 22, 2012, Plaintiff met with Brown and Tiede at the District Office, and Brown

informed her that she would be transferred to the ESE Department at the District Office for the

remainder of her contract, she would not be reappointed once it expired, and she would instead

be placed in an instructional position.[13] Pl. at 125:10-126:4, 131:20-23, 134:4-7, 177:17-23;

---

[11] Plaintiff feels that this was taken out of context. Pl. 124:8-9.

[12] Brown had kept Tiede apprised of her efforts with Plaintiff throughout the school year. Brown Dec. ¶19; Tiede Dec. ¶15.

[13] The District's policy for Re-assignments of Administrators (No. 1130.01) states that "administrators may be reassigned to any position for which they are qualified in order to meet the needs of the Board." Kuhn Declaration at ¶6, attached Ex. F.

Brown Dec. ¶20; Tiede Dec. ¶17; *see also* Ex. 18. Plaintiff reported to the ESE Department at the District Office for the remainder of her contract. Pl. at 131:23-132:9, 133:21-134:3. There was no change in title, pay or benefits. Pl. at 140:10, 177:2-6; Brown Dec. ¶20. The work[14] she was assigned was taken directly from other Supervisors in the Department. Brown Dec. ¶20. From this point forward, Plaintiff did not have any additional significant interaction with Brown, Holback or Tiede. Pl. at 132:12-20.

**Plaintiff is Not Selected for Lateral Positions/Removed from Pool:**

For the 2012/2013 school year, Plaintiff was assigned to River Ridge Middle School as a VE teacher. Pl. at 134:13-135:3. In June 2012, Plaintiff applied for a VE and/or support facilitation position[15] at Land O'Lakes High School (a lateral move) and learned that she did not get the position on or around June 25, 2012.[16] Pl. at 136:22-137:4, 140:4-17, 285:5-12, Doc. 18; Ex. 20. Plaintiff also applied for two or three Virtual Education positions between December 2013 and March 2014 which were also lateral moves that she did not get. Pl. at 151:1-5, 151:13-14,152:18-24, Doc. 18; Ex. 22, 23.

In July 2012, Plaintiff was informed that as a result of the performance concerns that led to her non-reappointment, she was removed from the Assistant Principal Pool and would be eligible to reapply starting with the 2014/2015 school year. Doc. 18; Ex. 21; Brown at 8:9-25; Brown Dec ¶22; Tiede at 24:20-25:15; Tiede Dec. ¶19. Plaintiff believes this is an example of discrimination. Pl. at 135:19-136:10. Plaintiff is not aware of any AP that returned to the AP pool after being removed from the position for performance. Pl. at 144:25-145:7. Once eligible,

---

[14] Plaintiff did not like the reassignment. Pl. at 177:7-9.

[15] Plaintiff claims that there were two positions (VE/EBD English teacher and support facilitation). Pl. at 138:9-139:2.

[16] Plaintiff identified three potentially successful candidates for the two positions she claims at are issue. Pl. at 140:18-23.

Plaintiff applied for the pool in April 2014. Pl. at 153:15-19, 213:17-25. Following a blind scoring process, Plaintiff's application ranked 41 out of 48 applicants, and she did not make the pool. Doc. 19-7; Ex. 32, Joel Di Vincent Dec. ¶5. Plaintiff believes this was discrimination. Pl. at 154:25-155:13, 282:23-283:3.

**School Board Policies**

The School Board has policies in place that prohibit discrimination and retaliation, along with a complaint procedure, and Administrators can also register a complaint with Employee Relations, any Assistant Superintendent, or the Superintendent. Kuhn Declaration ("Kuhn Dec.") at ¶5 attached Ex. E; Tiede at 22:18-25. Plaintiff is aware of and knows how to find the policies. Pl. at 160:20-161:1; 161:7-11. Other than talking to Brown about the Holback conversation, Plaintiff admits she "didn't try" to complain about her claim of discrimination to Employee Relations,[17] any Assistant Superintendent, the Superintendent or any other supervisor or manager; she did discuss it with teachers at HMS. Pl. at 126:9-22, 127:18-129:3, 129:19-130:20. Plaintiff did not raise any allegation of discrimination during the May 22nd meeting when she was told she would be transferred and not renewed. Pl. at 126:1-12.

**Plaintiff's First Charge:**

On May 18, 2012, the School Board received a Notice of Charge of Discrimination from the EEOC ("Notice") for Charge No. 846-2012-48965. Kuhn Dec. ¶3; Doc. 19-9, p. 5. The Notice indicated that Plaintiff had filed a charge, but it did not include the charge itself, and it stated, "no action is required at this time." *Id.* On May 29, 2012, the School Board received another Notice (Doc. 19-9, p. 6), this one dated May 23, and this time, it included a charge of

---

[17] Plaintiff never made a report to Employee Relations because she "didn't feel comfortable," even though she did not know anybody that had ever made a report to Employee Relations, and her opinion was based only on "things [she had] heard." Pl. at 127:18-129:3.

discrimination signed by Plaintiff on May 20, 2012 ("the First Charge"). Kuhn Dec. ¶3 attached

Ex. B. In the First Charge, Plaintiff alleges that she was discriminated against on the basis of sex

(female), in violation of Title VII of the Civil Rights Act. Doc 19-9, p. 7.

**Plaintiff's Second Charge:**

On July 6, 2012, the School Board received notice of a second charge of discrimination

from the EEOC, Charge No. 51-2012-02038, which Plaintiff signed on July 7, 2012 ("the Second

Charge"). Kuhn Dec. ¶4. The School Board received the actual charge on July 18, 2012. *Id*. In

her Second Charge, Plaintiff complains that the Board retaliated against her for filing her First

Charge with the transfer, non-reappointment, and assignment to a teaching position, which

Plaintiff contends happened on May 22.[18] Pl. at 178: 13-16, Pl. Ex. 24; Kuhn Dec. ¶4. Holback

did not learn of the First Charge until after Plaintiff had been removed from HMS. Holback Dec.

¶37. Employee Relations notified Brown and Tiede about the Notice (that did not include the

First Charge) on or about May 18. Brown Dec. ¶21; Tiede Dec. ¶18.

Plaintiff's Complaint asserts four counts: sex and pregnancy discrimination under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), as amended by the

Pregnancy Discrimination Act of 1978 ("PDA"), and the Florida Civil Rights Act of 1992, Fla.

Stat. 760.01 ("FCRA") (Counts I and III); and retaliation under Title VII and the FCRA (Counts

II and IV). Doc. 2. Defendant now moves for summary judgment on all claims and to strike

Plaintiff's untimely filed exhibits. Docs. 17, 28.

---

[18] Plaintiff complains that a newspaper printed a story about her First Charge (Pl. at 177:23-178:9, Pl. Ex. 24), but admits that her husband, not the Defendant, contacted the paper and asked them to do a story, that she willingly participated in an interview with the reporter, and during that interview, she told the reporter about her claims. Pl. at 178:10-12, 179:14-180:11.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 Fed. App'x 852, 858 (11th Cir. 2006).

## III.   DISCUSSION

### 1.    *Defendant's Motion to Strike*

Defendant filed a Motion to Strike Plaintiff's untimely filed exhibits (Doc. 28), to which Plaintiff did not respond. On November 29, 2016, Plaintiff filed a response in opposition to the

Motion for Summary Judgment which cited to various exhibits. Doc. 24. The exhibits were not attached to the response. On December 12, 2016, Defendant filed a reply in support of its Motion for Summary Judgment, in which it pointed out that Plaintiff had failed to file any exhibits with its response. Doc. 25. Three weeks later and without obtaining leave of Court, Plaintiff filed the exhibits referenced in the response. Doc. 27. In fact, Plaintiff filed the exhibits as a "Notice," indicating that the exhibits were inadvertently not filed with the response, without further explanation. *Id.*

"When an act may or must be done within a specified time, the court may, for good cause, extend the time." Fed. R. Civ. P. 6. Ordinarily, "[w]hether a motion was filed timely and is appropriate under a pretrial order is a question left to the district court's discretion." *Perez v. Miami-Dade Cty.,* 297 F.3d 1255, 1263 (11th Cir. 2002). Previously, Plaintiff was granted a ten-day extension to respond to Defendant's Motion for Summary, which was due by November 28, 2016. Doc. 23. Plaintiff filed her response on November 29, 2016, one day late, and the supporting documents on January 3, 2017. Docs. 24, 27.

Plaintiff's late filing does not comport with this Court's Scheduling Order, the Federal Rules of Civil Procedure and/or Middle District of Florida Local Rule 3.01(b). Plaintiff did not seek leave of court or provide a sufficient explanation for the delay in filing the exhibits in opposition to Defendant's motion. Defendant maintains, *inter alia*, that Plaintiff's untimely filing of the exhibits is prejudicial. The Court agrees. Defendant filed a timely reply in support of its motion on December 12, 2016. Because Plaintiff's exhibits had not been filed, in its reply, Defendant could only address the exhibits in a general manner. Defendant was left to guess and speculate as to the specifics of the exhibits. After careful consideration, the Court will grant Defendant's Motion to Strike Plaintiff's untimely filed exhibits. Plaintiff has failed to establish

good cause or excusable neglect for the untimely filing. *See King v. Chubb & Son*, No.8:10-cv-2916-T-24AEP, 2013 WL 523202, at *2 (M.D. Fla. Feb. 12, 2013) (untimely filed exhibits stricken where plaintiff did not seek leave of court and failed to provide a sufficient explanation for the late filing). Defendant's Motion to Strike will be granted.

### 2. *Defendant's Motion for Summary Judgment[19]*

### A. **Title VII /FCRA[20] (Counts I and III)**

"The Pregnancy Discrimination Act makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young v. United Parcel Serv., Inc*., 135 S. Ct. 1338, 1343, 191 L.Ed. 2d 279 (2015). When analyzing pregnancy discrimination claims, the Court uses the same type of analysis that is used for sex discrimination claims. *Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1312-13 (11th Cir. 1994); *see also Hamilton v. Southland Christian Sch., Inc.,* 680 F.3d 1316, 1320 (11th Cir. 2012). A plaintiff alleging a claim of pregnancy discrimination must show that her employer intended to discriminate against her because of her pregnancy. *Id.* at 1313. She may make that showing using either direct or indirect evidence. *Id.* Direct evidence of discrimination is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee" and "that, if believed, proves the existence of a fact without inference or

---

[19] As an initial matter, the Court notes that Plaintiff's response in opposition fails to adequately "provide pinpoint citations to the pages and lines of the record supporting each material fact" as required by this Court in the Scheduling Order. *See* CMSO; Doc. 11 (stating that "[g]eneral references to a deposition are inadequate."). *See also* Rule 56 (c)(1), Fed. R. Civ. P.

[20] The Florida Supreme Court ruled that "discrimination based on pregnancy is subsumed within the prohibition in the FCRA against discrimination based on an individual's sex." *Delva v. Cont'l Grp., Inc.,* 137 So. 3d 371, 375 (Fla. 2014) (internal quotation marks omitted). When considering claims brought under the FCRA, Florida courts look to decisions interpreting Title VII. *See Harper v. Blockbuster Entm't Corp*., 139 F.3d 1385, 1387 (11th Cir. 1998) ("Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII."). Thus, where a plaintiff is unable to maintain a claim under Title VII, she cannot maintain a claim based on the same conduct under the FCRA. *Id.* at 1389-90.

presumption." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004) (alterations and quotation marks omitted). Indirect evidence is circumstantial evidence. *Wright v. Southland Corp.,* 187 F.3d 1287, 1293 (11th Cir. 1999).

There is more than one way to show discriminatory intent using indirect or circumstantial evidence. One way is through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). Another way is "present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination. *Id.* If the plaintiff presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination, her claim will survive summary judgment. *Id.*

According to Plaintiff, Holback's discriminatory actions are as follows: (1) being assigned to FCAT testing (Pl. at 216:7); (2) being asked to arrange one presentation for the reading teachers when she did not supervise that department (Pl. at 82:11-16); and (3) Holback's failure to track Plaintiff down on one occasion when she missed an important call (Pl. at 82:21-83:1).[21] In addition, Plaintiff maintains that: (1) Holback was "annoyed" when married employees asked for a day off to move their children to college (although Holback gave them the day off and they still work for HMS) (Pl. at 170:18-171:6, 171:22-172:1), (2) Holback looked "inconvenience[d]" when a teacher requested a half-day to babysit a grandchild (although Holback granted the request) (Pl. at 171:7-

---

[21] Holback did in fact radio Plaintiff in order to remind her of the call. *See* Doc. 18-11; Ex. 11.

18

21); and (3) Holback "made mention" that a job candidate's children were often sick (although Holback hired that candidate). Pl. at 172:14-173:11.

### 1. Plaintiff has failed to establish direct evidence of pregnancy discrimination

Defendant argues that Holback's inquiry regarding Plaintiff's possible pregnancy for planning purposes is not direct evidence of discrimination. Plaintiff did not address this issue in her response in opposition. The Court agrees with Defendant. Courts in this circuit and others have found that an inquiry similar to Holback's was not direct evidence of discrimination. *See Torres-Skair v. Medco Health Sols., Inc.,* 595 Fed. App'x 847, 852 (11th Cir. 2014) (finding no direct evidence even after comments that the pregnant plaintiff was "moody," "hormonal," and that her pregnancy/medical restrictions were affecting her production); *Kocak v. Cmty. Health Partners of Ohio, Inc.,* 400 F.3d 466, 471 (6th Cir. 2005) (ruling that supervisor's question as to whether the plaintiff was pregnant or intended on having more children was not direct evidence of discrimination); *Laderach v. U-Haul of Northwestern Ohio,* 207 F.3d 825, 829 (6th Cir. 2000) (noting that direct evidence of sex discrimination consisted of testimony that defendant stated that he would not promote plaintiff because of her sex and did not want plaintiff to answer the telephone hotline because "women are not mechanically inclined"). Having determined that Holback's inquiry is not direct evidence of discrimination, the Court will now conduct the *McDonnell Douglas* burden-shifting analysis.

### 2. Plaintiff has failed to establish a true comparator

In order for Plaintiff "to establish a prima facie claim of pregnancy discrimination under Title VII, a plaintiff must establish that: 1) she is a member of a protected group; 2) she was qualified for her position; 3) she suffered an adverse employment action, and 4) employment or disciplinary policies were differently applied to her." *DuChateau v. Camp, Dresser & McKee, Inc.,*

713 F.3d 1298, 1302 (11th Cir. 2013). In determining whether employment or disciplinary policies were differently applied to her, a "comparator" is used. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091 (11th Cir. 2004). However, "the plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects." *Id.* "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Id.* "Deficient job performance remains a non-discriminatory basis on which employers may make employment decisions, so long as performance standards are applied equally." *Torres-Skair v. Medco Health Sols., Inc.,* 595 Fed. App'x at 854.

Here, Defendant argues that the fourth element has not been satisfied. Defendant maintains that Plaintiff has failed to name a comparator and/or provide any evidence about that comparator's disciplinary history. Defendant submits that the only possible comparator is Assistant Principal Marshall. But according to the Defendant, Plaintiff has failed to offer any evidence as to Marshall's disciplinary history. Plaintiff did not address this argument in her response in opposition. And upon careful review of the record, the Court finds that Plaintiff has not presented sufficient evidence to demonstrate that similarly situated employees, namely Marshall, were treated differently.[22] As such, Plaintiff has failed to satisfy the fourth element in order to establish a prima facie claim of pregnancy discrimination.

### 3.    *Plaintiff has not established pretext*

Even if Plaintiff could state a *prima facie* case, the School Board has provided a legitimate, non-discriminatory reason for its decision to transfer and demote Plaintiff. Plaintiff's performance as an AP has been below average since the day she got the position. Through three

---

[22] In fact, Plaintiff has not presented any evidence of a comparator. Instead, Plaintiff contends that she has sufficient non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination.

Principals and two District Administrators, Plaintiff continued to underperform. As early as Van Gorden in November 2007, Plaintiff understood there were concerns about her performance. Pl. at 35:17-20. Tiede reminded her again in August 2010, and Plaintiff claims she understood. Pl. at 48:13-17. In between these acknowledged warnings, Plaintiff so underperformed another Principal (Kupczyk), that Tiede was prepared to transfer her at the end of the 2009/2010 school year. Kupczyk Dec.¶7; Tiede Dec. ¶11. By July 2011, Plaintiff was a "significant concern" for Brown and Tiede, and one of only five Administrators in the District that earned this designation. Brown at 21:11-25, 23:1-25; Brown Dec. ¶4; Tiede Dec. ¶14. And indeed, some of this occurred before Plaintiff had any children, and all of it occurred before the Holback conversation. The record further reflects that Holback issued Plaintiff three detailed Notices of Performance Concerns throughout the 2011/2012 school year, one of which preceded Plaintiff's announcement that she was pregnant with her second child, all of which provided specific details of the performance deficiencies that prompted the Notices. Pl. at 54:19-55:7 (1st Notice), Pl. at 97:5-102:6, 104:15-25 (2nd Notice), Pl. at 113:3-10, 244:10-13 (3rd Notice)).  Indeed, Plaintiff admits to having engaged in the behaviors captured in each Notice. *Id*.

Here, the School Board has clearly established a legitimate, non-discriminatory reason for Plaintiff's transfer and non-reappointment. *See Torres-Skair,* 595 Fed. App'x at 854 (affirming summary judgment where the plaintiff received notice of performance deficiencies prior to notifying employer of pregnancy, even though termination occurred after notification). And as previously noted, once a defendant articulates a legitimate, non-discriminatory reason for its actions, the plaintiff then must show that the defendant's reason was pretextual. *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000). However, Plaintiff does not rebut and/or directly address the pretext issue in her response. As a result, Plaintiff has failed to show that

Defendant's reason for taking employment action was pretextual. *Slater v. Energy Servs. Grp. Int'l Inc.*, 441 F. App'x 637, 640-41 (11th Cir. 2011) (noting that plaintiff failed to show pretext where she "was counseled about her absences before she announced her pregnancy, and she failed to show that her performance issues and [the defendants'] concerns about those issues only began after her pregnancy announcement").

    4. *Plaintiff has failed to present sufficient circumstantial evidence to establish a prima facie case without a comparator*

   Plaintiff may still survive summary judgment by presenting sufficient circumstantial evidence to raise a reasonable inference of intentional discrimination. *Hamilton,* 680 F.3d at 1320. A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination. *Id.* Plaintiff must present "a convincing mosaic of circumstantial evidence that would allow a juror to infer intentional discrimination by the decisionmaker." *Lockheed-Martin Corp*., 644 F.3d at 1328 (citations omitted).

   Here, Plaintiff argues that her claim should survive summary judgment because she can present enough circumstantial evidence to raise a reasonable inference of intentional discrimination. Plaintiff contends that her positive performance evaluations, letter of recommendation from Van Gorden, and timing of the written performance concerns raise a reasonable inference of intentional discrimination.[23] She maintains that the first indication of "performance concerns" occurred *after* she returned from having a child and voiced her desire to

---

[23] Plaintiff's positive performance evaluations and letter of recommendation from Van Gorden are among the exhibits stricken by the Court as untimely filed.

have another.  Next, Plaintiff points out that prior to her return from maternity leave she had years of positive performance.

A sudden downturn in an employer's performance reviews could raise an inference of pretext. *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 834 (8th Cir. 2002); *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 331 (3d Cir. 1995) (noting that "the nonmoving plaintiff must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.'") (citation omitted); *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 779 (8th Cir. 1995) (stating that "demonstration of competence may serve as evidence of pretext when an employee is discharged for incompetence"); *see also E.E.O.C. v. Navy Federal Credit Union,* 424 F.3d 397, 408 (4th Cir. 2005) (noting that record evidence demonstrating that a plaintiff's supervisors "were pleased with her overall job performance and that her opposition to terminate [one of her subordinates] was the actual basis for her discharge.").

On the other hand, where an employer provides legitimate reasons for more recent negative reviews, mere evidence of past good performance does not demonstrate that the employer's legitimate non-discriminatory reasons cannot be believed. *Blair v. Atlanta Gastroenterology Associates, LLC,* CIVA 105-CV-2811-TWT, 2007 WL 2001769, at *12-13 (N.D. Ga. July 3, 2007); *Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 729 (8th Cir. 2001) (noting that "[a]n employer may choose to rely on recent performance more heavily than past performance"); *Roberts v. Separators, Inc.,* 172 F.3d 448, 453 (7th Cir. 1999) (concluding that a single positive review and raise ten months prior to the adverse action does not indicate pretext

in the face of evidence that the employee had a bad attitude on a number of specific instances occurring after the raise and review). Indeed, courts have held that past positive performance evaluations and "suspicious timing" of an adverse employment action are insufficient to demonstrate a triable issue of discrimination. *Blair,* 2007 WL 2001769, at *12; *Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 729 (8th Cir. 2001); *see also Henderson v. Waffle H., Inc.,* 238 Fed. App'x 499, 502 (11th Cir. 2007) (unpublished) (finding no error in the district court's conclusions that Plaintiff failed to establish a *prima facie* case of sexual harassment or retaliation);

Plaintiff also relies on the EEOC's determination of reasonable cause as evidence of intentional discrimination.[24] The Court has discretion to determine how much weight to afford the EEOC's determination of reasonable cause for discrimination and retaliation. *Assily v. Tampa Gen. Hosp.,* 814 F. Supp. 1069, 1071 (M.D. Fla. 1993); *Kincaid v. Bd. of Trs., Stillman College,* 188 Fed. App'x 810, 817 (11th Cir. 2006) (unpublished) (rejecting the plaintiff's contention that the EEOC determination raised a genuine issue of material fact); *but see, Horne v. Turner Constr. Co.,* 136 Fed. App'x 289, 292 (11th Cir. 2005) (unpublished) (holding that the district court should have taken into consideration in the summary judgment proceeding the EEOC's finding that there was reasonable cause to believe that discrimination occurred and that the court erred by failing to do so);*Rowell v. BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir. 2005) (noting that "on motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."). The Court has not considered Plaintiff's EEOC Letters because they were stricken. Even if they had not been stricken, The EEOC Letters of Determination

---

[24] The EEOC's Letters of Determination are among the exhibits stricken by the Court as untimely filed. The Court will not rely on these letters and, therefore, they provide no evidence of intentional discrimination.

would not be sufficient evidence, on the record before this Court, to defeat Defendant's motion for summary judgment.

Here, Plaintiff's conclusory allegations of intentional discrimination, without more, are insufficient to raise an inference of pretext and/or intentional discrimination. *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 597 (11th Cir. 1987). Defendant has offered extensive evidence of legitimate and nondiscriminatory reasons for its employment actions. *See e.g.* Tiede Dec. ¶5; Doc. 18; Reprimand Ltr., Ex. 3 (November 2007)(meeting topics included Plaintiff's work ethic, honesty, commitment to her job, and communication, among other concerns); Ex. 11; Brown Dec. ¶8 (December 5, 2011 meeting where Brown scored Plaintiff as "unsatisfactory."); Van Gorden at 8:10-20, 9:2-8 (Van Gorden describes Plaintiff as having "potential" but identified Plaintiff's commitment to putting the time needed into the job of Administrator and honesty as his main areas of concern.); Doc. 18, Ex. 4; Holback Dec. ¶¶10, 11 (September 20, 2011) (First Notice of Performance Concerns) (Holback was concerned that, *inter alia*, Plaintiff scheduled a non-emergency personal appointment during the school day, gave only 15 hours' notice, disregarded her mandatory work meeting, and did not meet with her prior to leaving that morning.); Ex. 11; Holback Dec. ¶¶22-25 (Second Notice of Performance Concerns dated May 4, 2012) (Plaintiff was at lunch during a scheduled conference call and Holback expressed her serious concerns about her oversight of the Emotionally and Behaviorally Disabled unit and placement of behavioral problem student in the office as a helper); Doc. 18; Ex. 16 (Third Notice of Performance Concerns) (Poor organization of HMS's athletic banquet on May 17, 2012).  The record is clear that Plaintiff's poor performance began prior to her pregnancy and continued throughout her time at HMS. Moreover, Plaintiff's characterization that her "reviews" were positive is also belied by the record. *See* Doc. 19, Ex. 30, 8:10-20, 9:2-8 Tiede Dec. ¶12.;

Holback at 21:5-25; Holback Dec. ¶3.(Tiede specifically spoke with Plaintiff about the fact that **both** of her prior Principals shared similar types of complaints about her performance which Tiede believed indicated that Plaintiff was not improving). Indeed, the record reflects that the School Board repeatedly attempted to coach Plaintiff in order to improve her performance, but Plaintiff continued to underperform.

Plaintiff has failed to establish a *prima facie* case of discrimination under the *McDonnell Douglas* burden-shifting analysis. Additionally, Plaintiff has not shown that the Defendant's reason for its employment action was pretextual. Likewise, Plaintiff has failed to present enough non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination. .As no genuine issues of material fact exist, Defendant is entitled to judgment in its favor as a matter of law as to Counts I and III of the Complaint.

### B.      Retaliation (Counts II and IV)

"To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) [s]he engaged in statutorily protected expression; (2) [s]he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998). "Title VII retaliation claims must be proved according to traditional principles of but-for causation...." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). When establishing a causal connection between the protected activity and the adverse action, generally a plaintiff must show that: (1) the decision-makers were aware of the protected conduct and (2) the protected conduct and adverse action(s) were not "wholly unrelated." *Walker v. Sec'y, U.S. Dep't of Air Force,* 518 Fed. App'x 626, 628 (11th Cir. 2013) (citation omitted).

*1.    Plaintiff has failed to establish a causal relationship*

In the instant case, Plaintiff alleges that the School Board's decision to transfer her to the District Office, not renew her AP contract and return her to a teaching position was in retaliation for having filed her First Charge with the EEOC. Plaintiff's contention is without merit. The record reflects that the decision to remove Plaintiff from HMS, as well as the decision to not renew her contract, had been contemplated for not only months, but years, before she engaged in any protected activity. In fact, the decision to transfer her from HMS *had* been made by Tiede in April/May 2010 although never communicated to her, and Brown had warned Plaintiff in December 2011 that if her performance does not improve, she would recommend to the Superintendent that her contract not be renewed at the close of the school year. Brown Dec. ¶7; Tiede Dec. ¶11. Furthermore, Brown and Tiede spoke throughout the 2011/2012 school year that Plaintiff would likely not be renewed (pre-charge). Tiede Dec. ¶14. In addition, Plaintiff admitted that she was responsible for a disastrous athletic banquet on May 17 (pre-charge) (Doc. 18; Ex. 16 (Third Notice of Performance Concerns) (Poor organization of HMS's athletic banquet on May 17, 2012)), and her regularly scheduled monthly coaching session with Brown and Holback had been scheduled for May 21 since at least May 16 (pre-charge) (Doc. 18; Ex. 9). The fact that the transfer and non-renewal were communicated to Plaintiff after the School Board received notice that she had filed a charge (not even her actual charge) is not dispositive.

"In a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon

discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). As such, Plaintiff has failed to show a causal connection between her protected activity and the adverse action.

2.    *Plaintiff has failed to establish pretext.*

Even if Plaintiff had shown causation, the School Board still prevails for the same reason that it prevails on the discrimination claim – it has produced a legitimate, non-discriminatory reason for its action, which Plaintiff has not rebutted with any evidence of pretext. *See e.g.* Tiede Dec. ¶5; Doc. 18; Reprimand Ltr., Ex. 3 (November 2007)(meeting topics included Plaintiff's work ethic, honesty, commitment to her job, and communication, among other concerns); Ex. 11; Brown Dec. ¶8 (December 5, 2011 meeting where Brown scored Plaintiff as "unsatisfactory."); Van Gorden at 8:10-20, 9:2-8 (Van Gorden describes Plaintiff as having "potential" but identified Plaintiff's commitment to putting the time needed into the job of Administrator and honesty as his main areas of concern.);  Doc. 18, Ex. 4; Holback Dec. ¶¶10, 11 (September 20, 2011) (First Notice of Performance Concerns) (Holback was concerned that, *inter alia*, Plaintiff scheduled a non-emergency personal appointment during the school day, gave only 15 hours' notice, disregarded her mandatory work meeting, and did not meet with her prior to leaving that morning.); Ex. 11; Holback Dec. ¶¶22-25 (Second Notice of Performance Concerns dated May 4, 2012) (Plaintiff was at lunch during a scheduled conference call and Holback expressed her serious concerns about her oversight of the Emotionally and Behaviorally Disabled unit and placement of behavioral problem student in the office as a helper); Doc. 18; Ex. 16 (Third Notice of Performance Concerns) (Poor organization of HMS's athletic banquet on May 17, 2012). Accordingly, Plaintiff has failed to establish her retaliation claim and to rebut

Defendant's legitimate business reasons for her transfer. *See, e.g., Turner v. City of Auburn*, 361 F. App'x 62, 65 (11th Cir. 2010) (affirming summary judgment where "no reasonable fact finder could find that [Defendant's] proffered legitimate, nonretaliatory reasons for its decisions were not what actually motivated [Defendant's] conduct and were, instead, pretext for retaliation"). As no genuine issue of material fact exists, Defendant is entitled to judgment in its favor as a matter of law on Counts II and IV of the Complaint.

### C. Plaintiff's Additional Complaints

Plaintiff appears to allege that other actions by Defendant were discriminatory or related to or in retaliation for her First Charge. For the 2012/2013 school year, Plaintiff was assigned to River Ridge Middle School as a VE teacher. Pl. at 134:13-135:3. In June 2012, Plaintiff applied for a VE and/or support facilitation position at Land O'Lakes High School (a lateral move) and learned that she did not get the position on or around June 25, 2012.[25] Pl. at 138:9-139:2; 136:22-137:4, 140:4-17, 285:5-12, Doc. 18; Ex. 20. Plaintiff believed that this was discrimination and retaliation. Pl. at 137:4. However, Plaintiff testified that she did not believe that Rick Mellon, the decision-maker for the lateral positions, discriminated against her. Doc. 18-1, Pl. at 142:8-16. Plaintiff speculated that the discrimination was based on whoever was in charge of Rick Mellon, likely Beth Brown or Tina Tiede. *Id.* at 142:8-16. Plaintiff testified that she did not know Rick Mellon. Doc. 18-1, Pl. at 141:25-142:3. Plaintiff also testified that she did not know the candidates hired. *Id.* at 140:20-141:25.

---

[25] Plaintiff identified three potentially successful candidates for the two positions she claims are at issue. Pl. at 140:18-23. Plaintiff also applied for two or three Virtual Education positions between December 2013 and March 2014, which were also lateral moves that she did not get. Pl. at 151:1-5, 151:13-14,152:18-24, Doc. 18; Ex. 22, 23.However, Plaintiff does not contend that these denials were discrimination/retaliation. Pl. at 152:13-14, 153:3-10.

Defendant argues that denial of a lateral position is without legal significance. Defendant maintains that Plaintiff failed to explain how denial of a lateral position could relate to Defendant's knowledge of the First Charge when she does not know the decision-maker or the successful candidate. Plaintiff does not respond to this aspect of Defendant's motion. Without question, the filing of the EEOC complaint satisfies the first prong for retaliation. Assuming, without deciding, that the denial of a lateral position was an adverse action, Plaintiff fails to show that Rick Mellon knew of her protected activity and took adverse action against her because of it. Indeed, Plaintiff admits that she did not know the decision maker and does not know who obtained the positions. Without more than Plaintiff's speculation, this contention fails.

In regard to being removed from the AP administrative pool, Plaintiff believes that this is an example of discrimination. Pl. at 135:19-136:10. Moreover, in July 2012, Plaintiff was informed that as a result of the performance concerns that led to her non-reappointment, she was removed from the Assistant Principal Pool and would be eligible to reapply starting with the 2014/2015 school year. Doc. 18; Ex. 21; Brown at 8:9-25; Brown Dec ¶22; Tiede at 24:20-25:15; Tiede Dec. ¶19. Plaintiff is not aware of any AP that returned to the AP pool after being removed from the position for performance. Pl. at 144:25-145:7. Once eligible, Plaintiff applied for the pool in April 2014. Pl. at 153:15-19, 213:17-25. Following a blind scoring process, Plaintiff's application ranked 41 out of 48 applicants, and she did not make the pool. Doc. 19-7; Ex. 32, Joel Di Vincent Dec. ¶5. Plaintiff does not rebut this evidence.

Defendant contends that Plaintiff's removal from the AP pool was consistent with District policy. Defendant further contends that Plaintiff's application rank was not based on discrimination but a blind scoring process. Plaintiff's response does not address this contention. And after careful consideration, the Court finds that these contentions cannot serve as a basis for

Plaintiff's discrimination and/or retaliation claims. Plaintiff only raises conclusory speculation regarding her failure to get the lateral positions and her blind ranking placement in the AP pool. Moreover, Plaintiff fails to establish that the blind-ranking on her application was related to her previous performance with the Defendant. In sum, Plaintiff's contentions are without merit.

### D. Failure to Exhaust Administrative Remedies

Title VII and the FCRA both require that a plaintiff timely file a charge of discrimination with the appropriate administrative agency. A failure to exhaust first requires dismissal. *See Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1225 (11th Cir. 2000). Discrete acts such as a denial of a position or promotion is a separate and distinct alleged violation of Title VII or FCRA with its own statute of limitations, and each must be brought within 300 or 365 days, even if related to timely asserted acts. *See National RR. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-115, 122 S. Ct. 2061, 153 L.Ed. 2d 106 (2002).

Defendant contends that Plaintiff never filed a charge of discrimination complaining about the lateral teaching positions or the AP pool. Plaintiff does not address this contention in her response to the Motion for Summary Judgment. There is no evidence before the Court to indicate that Plaintiff filed a charge complaining about the three to five lateral teaching positions or the AP Administrative pool (either her two year ban or inability to score well enough to return). Therefore, as an additional basis for dismissal, Plaintiff's additional complaints are dismissed for failure to exhaust administrative remedies.

### E. Conclusion

As no genuine issues of material fact exist, Defendant is entitled to judgment in its favor as to all counts of Plaintiff's Complaint. For the reasons stated above, it is hereby **ORDERED AND ADJUDGED**:

1.      Defendant's Motion to Strike (Doc. 28) is GRANTED.

2.      Defendant's Motion for Summary Judgment (Doc. 17) is GRANTED.

3.      The Clerk is directed to enter judgment in favor of Defendant, Pasco County School Board, and against Plaintiff, Buffey Simon-Leonard.

4.      The Clerk is further directed to terminate all pending motions and deadlines and close this file.

**DONE AND ORDERED** in Tampa, Florida on September 29, 2017.

*Charlene Edwards Honeywell*

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any